Good morning and may it please the court. My name is J.J. Conway and I do represent the appellants in this case, Ivan and Melissa Mitchell. I'm joined today by Ms. Christine Hahn from the U.S. Secretary of Labor's office. We are going to allocate seven minutes of our argument time to Ms. Hahn to present the arguments on standing and Article 3 standing and statutory standing under ERISA and we've asked to reserve a four-minute rebuttal. The district court's order... You'll have to watch your own time on the rebuttal if you go over it or it'll just come out of it. Of course, Your Honor. The district court's order that's on appeal contained within it three rulings. We contend in our briefs to the court that two of those rulings were correct and one of those rulings was incorrect and requires reversal. The case, in its broadest sense, presents the question, what is an ERISA participant's health care coverage and how did the insurer determine it? We contend that in answering those questions, the district court's order contained two errors. The first, the district court found that Blue Cross Blue Shield had violated the Mitchell's procedural due process rights under Section 503 of ERISA. It's our contention that once that finding was made, the case should have effectively stopped there. The court had three legally recognized options under this court's precedence and under ERISA, but instead, the court proceeded on with an analysis where it essentially was required to substitute its judgment for that of the plan administrator and that brings our second point of error. We believe that the court's contention that it had no authority to review Blue Cross's interpretation of an undefined contract term was also error. The court is likely aware that the parties stipulated to a remand of this claim before Blue Cross and Blue Shield of North Dakota and during that stipulated remand, Blue Cross Blue Shield had promised that the review would be full and fair and would guarantee the protections of Section 503. As the district court correctly held, the review was neither full nor fair. It was used as a sort of an off-the-court briefing to advance certain legal concepts that didn't appear in the initial denials and so applying this court's precedent in King against Hartford, the district court effectively discarded or threw out the decision and then proceeded to review the claim. What was the basis for that if you had agreed to a remand and agreed that it would be as though the decision was coming in the first instance? Why would the post hoc rationale cases have any application here? Your Honor, the post hoc rationale cases have an application because the stipulation required the plaintiffs to file their first amended complaint prior to the review taking place and there were three codes that were related to this health care claim that were ultimately resolved during the administrative review. The Blue Cross plan administrator indicated that this was a matter of settler function, fiduciary plan design. This was not something that you would ordinarily see in a review of a benefit denial. Typically, you review the plan terms, you review the protocols and guidelines and make your determination. In this particular case, concepts that were to be used for the defense of this claim began to be emerging in the review process and I believe that that's what the court found is that this was a ghost written argument that really didn't have much in the way of review. So the three recognized options we contend that the court had at this point were one, it could have ruled for the Mitchells. This was the third time that they had tried to the court discarded the rationale. We think that the Mitchells actually could have prevailed. This was an adverse benefit determination rationale. The second is the court could have applied a different standard of review. The Department of Health and Human Services has promulgated regulations that when there is an abuse of the claims process and rights are denied, your procedural due process rights, the plan administrator forfeits discretionary review. And so the court could have could have gone in that direction. The last is what this court did in King against Hartford was after it reviewed the claim, it remanded it for the plan administrator for reconsideration, eliminating outside interference and just simply reviewing the claims and isolating the substantial evidence that they said that this decision was reached, and then it could be subject to judicial review. What ended up happening is once the decision was put together, the elements of the remaining record. Now, the prior denial said nothing. They actually didn't continue. Why was it taken off the table? I'm still not following that. Your Honor, you agreed in this motion that it would be remanded for determination as if such claim were made for the first time without any presumption that the prior determination was correct. So if we're in a first-time decision, why would it be set aside, whether it's legalistic or whether it has legal concepts in it or not? Why isn't that an ordinary decision of the administrator that's subject to ordinary judicial review for abuse of discretion? So the idea behind this, Your Honor, was that the district court itself removed the decision from consideration. It said it didn't consider the decision. No, I'm asking why was that correct? What was the basis for that? Well, there were a number of things. The first was the court indicated that in its review preliminarily of that decision, that Blue Cross was coming up with different excuses for why it was denying claims that were not based either in their administrative guidelines or in the terms of coverage itself. Then secondly, and we had advanced this concept in our briefing below, that Blue Cross was using the process to discuss the idea of the settler function and unreviewability of plan terms. That's typically not something you would see in an application saying that a plan design concept is incapable of review. What we were asking Blue Cross to do is to explain its rationale for how it determined a Medicare rate was appropriate for the resolution of this, and what we ended up getting were a number of arguments within the context of this that were essentially legal arguments. They weren't just a plan review. And the regulations that apply to this say that we have the right to have the claim reviewed by the appropriate fiduciary. It's not supposed to be affected by outside influence. We've cited two cases... You mean a fiduciary is not entitled to consult with counsel? I wouldn't go so far as to say that a fiduciary... You mean by outside influence then? Well, Your Honor... Outside counsel? Yes, Your Honor. I don't believe that outside counsel should be involved in a full and fair determination under Section 503 of ERISA. And we cited two cases in our papers to the court where this was an issue. The McDonald v. Southern Life Insurance Company, and then we also cited the University of Hospitals of Cleveland. The idea is not to shore up a decision so that it can pass judicial muster. It's to review the claims fairly and then come out with your conclusion. And that was what we contend didn't happen here. So moving along the lines of once the review did take place, we have to look at whether or not there was substantial evidence to sustain this decision. And as I said, if we're arguing, assuming arguendo that those other options are not on the table, looking at this matter de novo or reviewing it for a full and fair determination, you have to isolate what did the plan have before it to support its decision making in this case. All there was was a rate sheet in 2014 that was provided to apparently approved providers that were in their network. But if you look at the claims file, there was no approved provider that could actually perform this service. No one was available to take this service. So that's the only evidence. But the evidence that's missing from the file is every bit as compelling. There was a regional error study that Blue Cross had undertaken. That was missing from the file. There's a multi-factor analysis that is used to determine rates and interpret this contract, which was in effect in 2015. There was nothing like that in 2014. So when you actually isolate the substantial evidence upon which they rely, it is one rate sheet that had nothing to do with participants' rights, not looking at their cost-sharing obligations, and effectively, there wasn't any substantial evidence to support this case. So I am going to stop there and allow my colleague to... We think Medicare has done a study about appropriate reimbursement for this, but we're going to give 150% of that. Your Honor, there was nothing in the file that actually created that justification. It was just simply a rate that was determined and applied essentially arbitrarily. And when we... It was premised on the Medicare reimbursement, as I understand. That's not arbitrary. If they say Medicare has a rate... So, Your Honor, I would direct your attention to the denial letter, where in the footnote, when we were asking about the mileage reimbursement, they said, if you don't care for that, just merge the codes that Medicare uses and recalculate the rates. So it wasn't a strict application of Medicare. Within this context, they allowed themselves broad administrative power to determine in what fashion they were going to apply Medicare rates. They weren't sticking strictly to the codes. So we do think that's a problem. All right. So we may reserve your time. That's fine. Ms. Han, we'll hear from you. Good morning, Your Honors, and may it please the Court. My name is Christine Han, representing the Secretary of Labor, appearing as amicus coriae in this case. I'll be presenting on the issues of constitutional standing and statutory standing. First, on constitutional standing, the Mitchells have constitutional standing under Article III because their claim that the plan denied them benefits confers a personal concrete stake in this case, constituting an injury in fact. And second, on the issue of statutory standing, the Mitchells have statutory standing to bring their ERISA action because they have a colorable claim to benefits. On the issue of constitutional standing, I have three points. First, four circuit courts have reached decisions supporting the assertion that plan participants have Article III standing to challenge benefit denials even if they are not billed. In the recent Sixth Circuit decision of Springer, as well as circuits in the Ninth, Fifth, and Eleventh Circuits, the injury here is a participant's loss of a right to benefits under an ERISA cover plan. Could there ever be a type of contract? There's a contract here raised between the air ambulance folks and the Mitchells. And I understand your position is that this particular contract does not preclude standing for the Mitchells. Would there be a type of contract that might preclude them from bringing this type of claim? If there is a contract that promised benefits and if an insurer is denying benefits, then the participant would have standing to bring that case. Well, maybe I'm talking about the wrong contract. There's an agreement between the air, the litigation agreement. Yes, Your Honor. So would there be, are you saying, is it your position that any type of litigation agreement is fine and the Mitchells would maintain standing? Or are you saying that there's just nothing about this particular litigation agreement that would preclude it? Our position is that any agreement with a third party, and in this case, the air ambulance provider, would not deprive the Mitchells of standing because the Mitchells have not assigned a right to sue. In this contract or any other type of contract with a third party, there is nothing between Blue Cross and the participant that would deprive the participant to bring the rights under the plan to enforce. Short of assigning the right to actually bring the action? Exactly. Yes. And the July 2015 agreement in this case only assigned the proceeds of litigation, not the rights to sue. Blue Cross argues that because the Mitchells are not being financially harmed, they have lost their right to sue in court. But the harm here is a denial of plan benefits by Blue Cross. And the fact that they may later transfer these benefits to a third party does not deprive them of rights to bring this action and deprive them of constitutional standing. This was recognized in the Sixth Circuit under Springer, as well as cases that said that a provider, as the assignee, has standing because the provider had originally had standing. In addition, the circuit decisions comport with a Supreme Court ruling in Spokio that states that intangible injuries can be concrete for constitutional standing purposes. The two factors that Spokio considered was common law principles and congressional intent. Congressional intent under ERISA is to protect contractually defined rights. When the Mitchells signed on to their insurance plan, they entered into a contract with Blue Cross, and Blue Cross decided to deny these contractually defined benefits, which is what brings the right to judicial review in First District Court and timely appeal to this court. As for common law principles, the harm that's the basis of the Mitchells' suit is a violation of plan terms, and this is akin to a breach of contract, which the Supreme Court has recognized, as well as numerous circuit courts. Therefore, because the July 2015 agreement did not eliminate the Mitchells' personal stake in this case, there is a case in controversy that exists, which asserts that the Mitchells have constitutional standing to bring this suit. As for statutory standing, the Mitchells have statutory standing under 502A1B because they have a colorable claim to benefits. The standard, as correctly found by the District Court, is that it be non-frivolous and that they have a colorable claim. The fact that the District Court sided with the Mitchells on one of the merits of this case shows that they indeed have a colorable claim. They were a party to this contract, and they have successfully brought their case in a timely manner by exhausting all administrative remedies and appealing in Federal District Court. And therefore, we respectfully request that you affirm the District Court decision to find that the Mitchells have constitutional standing and statutory standing. So how would you define their injury in a couple sentences? Their injury is a denial of plan benefits in their entrance plan with Blue Cross. Even though they won't get the benefits? Even though they will later transfer these benefits under the separate agreement, they were denied contractual rights as promised under the plan. Okay, thank you for your argument. Mr. Kristina, we'll hear from you. Thank you, Your Honors, and may it please the Court. My name is Tom Kristina. I have the honor of representing Blue Cross Blue Shield of North Dakota in this matter. In the Federal Courts, the consideration of subject matter jurisdiction always comes first. And because the Supreme Court considers the case or controversy requirement to raise a subject matter jurisdiction issue, that's where I will begin. Let me say at the outset that this is not a case which is attempting to attack the Supreme Court's notion that an assignee doesn't have standing under ERISA. This is not even an assignment case. Instead, it's a case that because of a unique constellation of facts, facts that may never happen again, trigger the decision that the Mitchells did not have Article III standing. So let me just go quickly through what the Supreme Court has said are the essential rules of law regarding Article III standing. The first is that standing must exist throughout the case. That's in the Pizer decision and then more recently Arizona's for official English. The fundamental rule of Article III standing is that the plaintiffs must have a stake in the outcome. That's data processing versus camp, which all of us recall from law school. It is plaintiff's burden to prove the elements of standing with the type of proof necessary at a given stage in the litigation. That's the Lujan case and I believe that was also repeated in Spokane. The Lujan decision came up with a three-factor test, which the late Justice Scalia called the irreducible constitutional minimum for Article III standing. That minimum has three elements. First, there has to be an injury in fact. Second, the injury has to be traceable to the conduct of the defendant. And third, the injury has to be likely to be redressed by some judgment that the federal court could render in the action. And then finally, in Daimler-Chrysler, although they were citing an earlier decision, Los the court said that standing is not dispensed in gross. The plaintiff has to prove the elements of standing for each claim and each form of relief sought. Now with those rules in mind, let me discuss what I think are the unique constellation of factors here. The first and probably most important is something that Judge Kelly has alluded to already, and that is what the plaintiffs call the litigation agreement. The agreement between Mr. and Mrs. Mitchell and Valley Med Flight, the air ambulance provider. What makes that agreement unique is that it extinguishes the plaintiff's right to benefits under the plan. And that is because the plan provides for benefits in the form of reimbursement. Isn't that the same in a lot of these litigation agreements? Why is this one different? Your Honor, I'm not qualified to say because I've never seen an agreement like this. I don't know whether this is typical. Well, it seemed like in the other cases there were agreements that any money that was obtained through the litigation would be then transferred to the original provider. If Your Honor is referring to the Sprint case, the one about the dial around fees, there the agreement between the consolidator and the pay phone owners didn't extinguish the right of the pay phone owners to their dial around payments under an amendment to the Federal Communications Act. The plaintiff in that case was simply an aggregator who took assignments of those rights so that there would be a large enough number of payments a dollar amount to justify the lawsuit. In this agreement, as soon as, the agreement was of course executory until the Mitchells filed their complaint. But as soon as the Mitchells did what was required of them under the agreement, Valley Med could no longer look to them for any amount of the balance of Valley Med's fees. So that means that there was nothing to be reimbursed in this case. Because if reimbursement has any meaning in the English language, surely it means that if A pays money to B, then A pays money to B, then C will pay money to A. Where in this case, A was never going to pay any more money to B. The Mitchells, I assume, paid over the amount that was allowed in this case, and they would never be in a position where they would be called upon to pay any more. What if they win the case? If they win the case, the proceeds... Don't they get money that they're going to pay over to the company? They get a judgment. But whether or not they're actually going to act as a conduit for those funds, I couldn't say. You just said they were never going to pay any funds over to the company. They were never going to pay any of their own funds over to the company. They were never going to have to reach into their own pockets so as to trigger a right to reimbursement. So you think it's just a matter of timing? If the company had just said, we'll hold off on collecting until we see how the litigation comes out, and then they finish the litigation, the Mitchells pay over whatever they get, and the company says we'll write off the balance, that would be fine. But because they agreed to it ahead of time, they have no standing? Is that your theory? My theory is that yes. Because the act of filing the suit was the only performance required of the Mitchells, that turned the contract from an executory agreement into an executed contract and it fixed the Mitchells' rights to be absolutely immune from any claim against them by ValleyMed based on the transportation from Canada to Grand Forks. What about the split of the remainder, 70-30? As we've said in our brief, we think that that is window dressing because the only recovery that can be had in a case under Section 502A1B is a recovery of benefits under the plan, and you have to assume that if the plaintiffs won, that would be the balance due. Plus, in the court's discretion, a reasonable attorney's fee, which couldn't, it wouldn't be reasonable if it exceeded the actual expenditure. So there was never going to be a third. Is that getting to the merits? Is that dangerously getting into the merits to decide this? No. It's actually looking at what remedy could the court give. As a matter of statute? Yes. What about this theory? I thought the way the government's lawyer finished there was to say something along the lines that they're entitled to the benefit of the bargain. If they hadn't entered into an agreement that immunized themselves from any further pain payments or obligations to Valley Med, then I think in accordance with what Judge Kelly was alluding to, then I think you're required to assume that they might have recovered something because you're not allowed to get into the merits, at least not to decide the merits in the course of a standing controversy. But those are the two things that I think are true. Those aren't the facts here. No, no. I thought the argument was they had an agreement with the administrator that they would be able to recover a certain amount. And they did. They were paid what the plan allowed. What's at issue here is that the complaint or the amended complaint seeks more than what is allowed under the policy. But the Mitchells were paid about $6,500. I thought their whole complaint though was they're entitled to more under the policy. They claim that they are entitled to more under the policy. So their standing argument is we had a deal with the administrator that we should be paid more than $6,500 and we're injured by them not... But their right is not to be paid, it's to be reimbursed. And because they would not be parting with any more money, they no longer had a right to reimbursement because there would be nothing to reimburse. I think the significance of this is clear. The section, they are suing only under one section of ERISA, 502A1B. And there you can bring an action to recover a benefit under the terms of your plan to enforce a right under the terms of your plan or to clarify your right to future benefit. Under the plan. The future benefits issue is off the table, obviously. And that is the only reason why it's relevant that the Mitchells are no longer covered under this plan. Mr. Mitchell was the CEO of the first hospital that he took his wife to, but he left and is now a CEO out of state someplace else. So if I'm correct, that reimbursement means reimbursement, there isn't any benefit owing and there isn't any right to a benefit that can be enforced. So that's why, in addition to lacking constitutional standing, we've also argued that they lack statutory standing. But basically for the same reasons. Well, a little bit different. The standard is whether or not they had a colorable claim to a benefit. Given how clear it is that the right is reimbursement, and given how clear the language of that agreement is, we don't think they had a colorable claim to a benefit. And I'm going to turn to the merits, well, very quickly now, because my time is running out. Yeah, that would probably be a good idea. Yes. So just one more point on standing, and that is, I think the Secretary of Labor may have misunderstood how fact-specific this case is, and may have misunderstood that this case has nothing to do with assignments, and it has nothing to do with circumstances in which the provider has refrained from billing, but the participants didn't have a legal right to be immune from billing in the future. And that's what distinguishes the other circuit decisions that have been cited. But in any event, the Secretary says on page 27 of the amicus brief that Blue Cross Blue Shield has advanced some theory about the Mitchells having assigned the right to sue, and when I read that, I thought, that doesn't sound like anything I would say. So I checked their site, and sure enough, we never argued that. That is not an issue in the case. The standing issue is, as I've said, there is no concrete stake in the action, and the plaintiffs didn't carry their burden to prove that there was. Let me now quickly turn to the merits. Plaintiffs argue that the court could have applied a different standard of review below. And this is based on the court saying that it was going to ignore the decision letter. I think, in answer to Judge Colleton's question earlier, that the reason the district court gave for that was that the decision letter was long and prolix. Which it was. And it was. And there is a reason for that. That reason is that the claim advanced a very novel theory that the emergency treatment provisions of the Affordable Care Act apply to air transportation from one facility to another. Okay. Well, why don't we cut to the chase, since you're down to two minutes and 30 seconds. Yes. What do you think the standard of review should be, and how should we analyze it? The standard of review, as I think everyone has agreed, in this court, is use of discretion. Yes, exactly. So what do we do with the decision? How should we review it? You should uphold it, except with respect to the IV fluids charge. Okay. What about on the air ambulance charge? Why was the decision reasonable? The decision was reasonable because the plan decided the claim by applying the terms of the plan. The terms of the plan used Medicare rates for the, there's a base fee and then there's a per mile fee, the way that Medicare does this. It was based on 1.5 times that. Where did that come from? I am not positive. I think it was a decision that was made by Blue Cross Blue Shield as an agent of the employers who subscribed to that policy. Because it's not, what we're looking at is allowed charge, right? What's an allowed charge for this particular service? That's right. And so it's their interpretation of how you calculate an allowed charge for a particular service. Yes. And it's hardwired into the program that is used to analyze these claims. But once Blue Cross says, here are the rates we use, Blue Cross has no discretion to say, oh, well, we'll use this rate for Ralph, but not for Steve. No, I think their position is the rate was not reasonable in the first place. And that is not a question for the courts, because the Supreme Court has said time and again that employers are not even required to have these plans. But the terms of coverage are up to the employer. For the rest of the argument, we'll rest on our brief. Thank you very much, Your Honors. All right, Mr. Conway, we'll hear from you in rebuttal. That doesn't look like the right amount of time. Ms. Hahn had a minute and a half left. I see. Why isn't this the term, a term within the plan that we can't look back, look into? So I think that that's the fundamental disagreement of the case. I think that's the fundamental misunderstanding in the order. There is a difference between plan design, typically not reviewable, and plan interpretation, fully reviewable under 502A1B. This is an interpretive decision of Blue Cross that this court is being asked to look at. So an interpretation of the allowed charge for this particular service. And yet what we're also looking at is whether that interpretation is consistent, right, across individuals. Is it consistent across years? It seems a little bit different than applying a particular term within the plan to an individual person's situation. How does this term apply in this sort of unique, this isn't unique, this is a regular service that folks use under this plan. It sort of seems to be somewhere in between the plan itself, allowed charge, and sort of that individual application. I'm trying to figure out where this 150% of Medicare falls. So that I thought was one of the more compelling parts of my opposing counsel's argument. When you asked Blue Cross where did this come from, there really wasn't an explanation of how they determined this. And that was the argument, the thrust of our argument in the case is at least show us the evidence that you used to arrive at this. It's nonexistent. There is one rate sheet, and frankly the only justification for using a Medicare rate that ever appeared in this case appeared in the Blue Cross summary judgment motion where the lawyers made the argument, sort of backing up HHS and how they go about rate setting. That doesn't exist in any document that was before this plan administrator. It just so happened that in this case that was what was discovered, that there was no actual justification for applying this rate. Is this unique to air ambulance services? Is this the type of thing that plans leave open in this fashion in other contexts for other services? Or did that even come up within the district court's record? Your point is essentially taken in the context of this is a generic term that has no independent meaning allowed charge. It has to be read in the context of an air ambulance transport. And other plans use other languages. We cited HCA Healthcare, which used the exact same language, but it put the policyholders on notice and said, by the way, when we figure out the allowed charge, here are the variables we're going to look at. And it set forth all of these different variables, so policyholders at least knew what they were dealing with. The Mitchells had a kind of – You didn't bring a notice claim. You didn't bring a breach of fiduciary duty or some kind of claim that they didn't get adequate notice. Right. And the reason – We're talking about the – We're just – it's a straight review of the plan administrator's decision and what evidence did they have before them when they made that determination. As we cite in our brief, and you have it in the Joint Appendix at page 871, they, in interpreting the allowed charge, go through a rigorous analysis in 2015 of what is necessary, including the cost structure for providers, whether or not they're adequately serving rural communities, whether or not their insurance can be transported appropriately. So these are all factors that go into determining this charge. This was in 2015. The absence of that in 2014 indicates that this issue just wasn't looked at. And so when we pressed to find out what the justification was, as you saw here, they really don't know what the justification is. They just cite Medicare. I mean, there's reasons for this. The court found that this was a conflicted administrator, that they had a financial interest in the outcome, and that there were some issues that they had with the provider in outside litigation. But when they were trying to figure out how this rate was applied, they're the only ones who seemed to benefit. This was a $33,000 charge that they paid about $6,500 on. And when you press them for how they came up with this and how they square that with a contract that was issued to the Mitchells that said that they would have ambulance services that provided 80% of an allowed charge yet to be determined, I think it bears mention here that in looking at the goal of the plan here, I don't think a reasonable person, particularly in a rural community, would understand that 80% of an allowed charge would actually result in a claim determination that was exactly the inverse. The Mitchells were left owing 80%. Why don't you take one shot at standing? Why don't you address why the fact that there's no reimbursement obligation doesn't eliminate standing and distinguish your case from the assignment cases or the cases where the company doesn't try to collect and just create a very narrow situation here where you've contracted yourself out of standing? Thank you for allowing me to address that, Your Honor. And I would just say this. First of all, the word reimbursement is used nowhere in this contract. There are covered services. They pay claims. And you can think about that in a broader context with very expensive health care claims. Who is going to be able to pay for those and then seek reimbursement from the plan? So that language doesn't appear anywhere in this Blue Cross contract. You don't sue for reimbursement. You sue for coverage. That's the first thing. The second thing is this was a non-participating provider. And within the context of a non-participating provider, the language in the Blue Cross plan, and this is where plan design actually does have something to do with this case, it says that you cannot assign your right to benefits to an outside person and that the payment is made directly to the subscriber. So if the Mitchells hadn't signed an agreement and they brought this action under enforcement, all they could do was have a check that was issued in their name that they would then have to turn over to their provider. That is a plan term. The other part of standing, Your Honor, that I think is important is Blue Cross decided to import the ERISA protections within the statement of ERISA rights at the end of that contract. So those are independent rights that they have that are contractual, including one of the chief rights is determining how your claim was administered and determined. That's an independent standalone right that the Mitchells could have gone in and sued on just to find out how the claim was determined. Well, they didn't sue on that. Part of the basis is how did you determine the rate that you applied? What was the justification for that? So they did bring an action in part arguing to secure Blue Cross's determination. All right, very well. Thank you very much. Thank you for the argument from all counsel.